**THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

|  |  |  |
|---|---|---|
| SELENE DANIELLE ARRIAGA, | ) | |
| | ) | |
| *Plaintiff,* | ) | |
| | ) | No. 20 C 4498 |
| v. | ) | |
| | ) | Judge Virginia M. Kendall |
| THOMAS J. DART, Sheriff of Cook County, | ) | |
| Illinois; THE NORTHEAST REGIONAL | ) | |
| COMMUTER RAILROAD CORPORATION | ) | |
| d/b/a METRA; COOK COUNTY, ILLINOIS; | ) | |
| MARIE RANGEL, JOSEPH PEREZ; PAUL | ) | |
| RIGGIO; DAVID CAMMACK; THEODORE | ) | |
| STAJURA; and TIMOTHY O'DONNELL | ) | |
| | ) | |
| *Defendants.* | ) | |
| | ) | |

**MEMORANDUM OPINION AND ORDER**

Plaintiff Selene Arriaga initiated this action against Defendants Northeast Regional Commuter Railroad Corporation ("Metra"), Cook County, Illinois, and seven other named Defendants for revealing her transgender status and failing to curb the discrimination and harassment that resulted from this disclosure. Arriaga alleges violations of her Fourteenth Amendment substantive due process and equal protection rights under 42 U.S.C. § 1983 for disclosure of medical information and failure to supervise and protect. She further alleges violations under state law for discrimination on the basis of gender, Illinois Civil Rights Act, 740 ILCS 23//5(a), and indemnification. Before the Court are Defendants' respective motions for summary judgment (Dkts. 214, 216, 217) and for sanctions (Dkt. 230). For the following reasons, Defendants' motions for summary judgment [214, 216, 217] and motion for sanctions [230] are granted.

1

## BACKGROUND

### I.    Failure to Comply with Local Rules for Summary Judgment

Defendants filed a joint statement of material facts in support of their respective motions for summary judgment. (Dkt. 218). Though some of Defendants' facts are impermissibly long, Defendants collectively submitted only 97 facts, when each Defendant was entitled to 80 facts each.

Arriaga was required to submit a response, "set[ting] forth the text of the asserted fact" followed by her response. LR 56.1(e)(1). In the case of disagreement, Arriaga was required to "cite specific evidentiary material that controverts the fact," concisely explaining "how the cited material controverts the asserted fact." LR 56.1(e)(3). In contravention of the local rules, Arriaga filed a response filled with statements of opinion and devoid of meaningful references to the record. (Dkt. 239-4). Arriaga also filed a non-compliant statement of additional facts, which haphazardly identifies many exhibits by working titles rather than exhibit numbers. (Dkt. 239-5). Like Defendants, Arriaga provided lengthy statements lumping multiple facts into a single paragraph. (Dkts. 218, 239-5).

The local rules make clear that "[a]ll material facts set forth in the statement required of the moving party will be deemed to be admitted unless controverted by the statement of the opposing party." LR 56.1(b)(3)(C). The Court has discretion to require strict compliance with Local Rule 56.1. *See e.g.*, *Flint v. City of Belvidere*, 791 F.3d 764, 767 (7th Cir. 2015) (collecting cases); *Stevo v. Frasor*, 662 F.3d 880, 886–87 (7th Cir. 2011) ("Because of the high volume of summary judgment motions and the benefits of clear presentation of relevant evidence and law, we have repeatedly held that district judges are entitled to insist on strict compliance with local rules designed to promote the clarity of summary judgment filings."); *Cracco v. Vitran Express,*

*Inc.*, 559 F.3d 625, 632 (7th Cir. 2009); *Ciomber v. Coop. Plus, Inc.*, 527 F.3d 635 (7th Cir. 2008).

Because Arriaga failed to respond to the vast majority of Defendants' facts with evidence substantiating her denials, the Court accepts Defendants' Local Rule 56.1(a)(2) statement as true for purposes of this motion—to the extent supported by evidence. *See, e.g.*, *Apex Digital, Inc. v. Sears, Roebuck & Co.*, 735 F.3d 962, 965 (7th Cir. 2013); *Parra v. Neal*, 614 F.3d 635, 636 (7th Cir. 2010). The Court will disregard the assertions in Arriaga's Rule 56.1(b)(3) statement of additional facts to the extent those assertions lack evidentiary support or intelligible cites to the record. *See Klein v. Wexford Health Sources, Inc.*, 2019 WL 2435850, at *2 (N.D. Ill. June 11, 2019); *Church v. Church Mut. Ins. Co.*, 2016 WL 772787, at *1 (N.D. Ill. Feb. 29, 2016), *aff'd sub nom. Olivet Baptist Church v. Church Mut. Ins. Co.*, 672 F. App'x 607 (7th Cir. 2017).

This is by no means an automatic grant of Defendants' motions. *See Keeton v. Morningstar, Inc.*, 667 F.3d 877, 884 (7th Cir. 2012) (noting the movant "must still demonstrate that it is entitled to judgment as a matter of law"). The Court will thus recite the facts as favorably to Arriaga as the record and Local Rule 56.1 permit, before determining whether Defendants are entitled to judgment on those facts. *Hudson v. Ne. Illinois Reg'l Commuter R.R. Corp.*, 2019 WL 4261581, at *3 (N.D. Ill. Sept. 9, 2019) (citing *Johnson v. Advocate Health & Hosps. Corp.*, 892 F.3d 887, 893 (7th Cir. 2018)).

## II.    Factual Background

### A.  Arriaga's Application to Metra

Selene Arriaga is a transgender woman who has been diagnosed with gender dysphoria. (Dkt. 218 ¶ 1; Dkt. 218-2 at 51). In February of 2018, Arriaga applied for a job as a police officer at Metra. (Dkt. 218 ¶ 19). As part of the application process, Arriaga was required to undergo a background check and medical evaluation; she also signed a form authorizing Metra to provide

copies of these documents to anyone "authorized to participate in the vetting of [her] qualifications and background for employment purposes." (*Id.* ¶ 20). Further, the authorization form released "Metra Police, its agents, and designees … from any and all liability which may be incurred as a result of furnishing such information." (*Id.*).

As part of the background check, a Metra investigator conducted a home visit at Arriaga's residence. (*Id.* ¶ 23). During the home visit, Arriaga noted that she is transgender and asked whether Metra could provide accommodations to transgender recruits. (Dkt. 218-11 at 4). The investigator explained that her questions would be addressed as she continued in the hiring process. (*Id.*). The investigator then prepared a report of his findings during the background check, which noted Arriaga's inquiry into accommodations for transgender applicants and recommended that she be allowed to proceed to the next phase of the hiring process. (*Id.* at 5). Later, Metra Police Chief Perez and Deputy Police Chief Riggio reviewed Arriaga's background check report and interviewed Arriaga, as they did with each candidate for employment, in accordance with Metra's vetting procedures. (Dkt. 218 ¶ 25). After the meeting, Perez recommended that Metra hire Arriaga as a police recruit. (*Id.*). Perez never discussed Arriaga's transgender status with anyone other than Deputy Chief Riggio. (*Id.*).

**B. Preparation for Arriaga's Arrival at the Academy**

Riggio directed Metra Police Commander Ross Fuller to ask the Cook County Sheriff's Office Training Academy ("Academy") what policies, if any, it had in place to accommodate transgender recruits. (*Id.* ¶ 26). Fuller called Sergeant David Cammack. (*Id.* ¶ 26; Dkt. 218-4 at 18–20). During the call, Fuller and Cammack spoke about the POWER test, which is required by the Illinois Law Enforcement Training Standards Board ("Standards Board") to evaluate recruits' physical endurance and their ability to meet the physical qualifications required to become a police

officer. (*Id.* ¶ 27–29). The POWER test has different standards for evaluating men and women and failure to meet the standards will preclude a recruit from entering the Academy. (*Id.* ¶ 28).

While discussing the POWER test, Fuller, without identifying Arriaga by name, asked about the Academy's ability to accommodate a transgender recruit and how it would issue the POWER test to such a recruit. (*Id.*). Cammack did not answer immediately, but contacted Marie Rangel, Director of the Academy, to escalate the question. (*Id.* ¶ 30). Rangel indicated that she needed to ask the Standards Board because the Academy had never before received a transgender recruit. (*Id.*). The Standards Board, after conferring with its law department, responded stating that the Academy could accept the recruit and administer the POWER test consistent with the gender that person identified with. (*Id.* ¶ 31).

Separately, Cammack reached out to Dean Rockafellow at Triton College, where the Academy was held, to ensure that gender neutral restrooms and showers were available if a recruit required or requested them. (*Id.* ¶ 32). Rangel and Cammack toured the Triton facilities themselves to evaluate what accommodations were available. (*Id.* ¶ 33). During the tour, they emphasized the importance of maintaining the recruit's confidentiality and keeping the recruit as comfortable and safe as possible. (*Id.*).

### C. Disclosure of Arriaga's Identity

Before the recruits arrived at the Academy, Cammack held an "all staff" meeting—which included Director Rangel, Deputy Chief Ruel and Officers Juan Claudio, Brian Hartsfield, Jaunesh Contreras, and Antoinette Bradley—to notify his team that there was a transgender recruit coming to the Academy. (*Id.* ¶ 42). In this meeting, Cammack informed his team of the resources and facilities available to transgender individuals and explained that anyone with reservations about working with a transgender person could request to be transferred to a different post. (*Id.*).

Cammack disclosed Arriaga's identity as a transgender person in this meeting to ensure her safety, protection, and education, and because the instructors needed to know what testing procedures applied to Arriaga. (*Id.*). Cammack and Rangel reiterated the confidentiality of Arriaga's information and reprised the list of resources available to ensure Arriaga was protected and comfortable. (*Id.*).

On April 10, 2018, when the recruits took the POWER test, Arriaga first met Paige Visnevac, a fellow Metra recruit. (*Id.* ¶ 49). After the POWER test, Arriaga and Visnevac went for a walk to the beach. (*Id.*). During the walk, Visnevac shared that her dad, Metra Police Sergeant Klima, told her that one of the Metra police recruits was transgender. (Dkt. 218-2 at 64). Arriaga then revealed her transgender status and asked Visnevac to keep that information to herself. (Dkt. 218 ¶ 50). That same day, Arriaga posted a picture of herself in the "My Trans Life Group" on Facebook with the caption: "Hey everyone, new to the Group… Been in transition 4 [years] now. Just got accepted to [the] police Academy. So [e]xcited its been a long journey and process and I want to let everyone know, no [a]chievement or goal is ever out of reach!" (*Id.* ¶ 58). Sometime that day, Arriaga's friend, Metra Police Officer Marisol Aleman, told Arriaga that her "business" was all over the Metra Police Department. (*Id.* ¶ 51).

On May 7, 2018, the first day of training at the Academy, Arriaga informed Cammack of her transgender identity and asked about physical and facility-related accommodations. (*Id.* ¶ 44). Cammack showed Arriaga to facilities she could use other than the women's locker room, but ultimately Arriaga used the women's locker room throughout her time at the Academy. (*Id.* ¶ 47).

On two separate occasions in June, Arriaga also disclosed her transgender status to two other recruits: Erin Hansen, a recruit from the LaGrange Park Police Department, and Alyx Martinez, a recruit from the Cicero Police Department. (*Id.* ¶ 52).

6

### D. CCSO Officer Robert Devogelear and Other Non-Metra Recruits Discuss Arriaga's Transgender Status

In June 2018, Arriaga discovered that Officer Robert Devogelear, a Cook County Sheriff's Office ("CCSO") employee, divulged her transgender status to two recruits in the Academy—Dennis Leonardo and Dylan Chalem, both from the Waukegan Police Department—and those two recruits, in turn, revealed Arriaga's identity to Rachel Richardson, a Mount Prospect Police Department recruit. (*Id.* ¶ 63; Dkt. 218-2 at 67–68, 76–78). Richardson found a picture of teenage Arriaga, presenting as male, on Arriaga's brother's Facebook page and began sharing that picture with others. (*Id.*). Arriaga did not initially report this conduct to anyone in supervision or human resources at Metra. (*Id.* ¶ 65). She told her friend, Marisol Aleman, who took it upon herself to report the conduct to Metra Deputy Chief Riggio. (*Id.*). Riggio contacted Arriaga that same day. (*Id.*). Arriaga also told CCSO Officer Claudio, who promised to get to the bottom of the situation and encouraged her to come to the Academy the following day. (*Id.* ¶ 66).

The next day, Arriaga reported to the Academy where she met with Officer Claudio, Sergeant Cammack, Officer Contreras, and Deputy Chief Ruel. (*Id.* ¶ 67). Arriaga reiterated what she heard about Richardson and Devogelear's misconduct. (*Id.*). This was the first time Cammack was made aware of any issues pertaining to the confidentiality of Arriaga's identity. (*Id.* ¶ 70). Arriaga noted that she wanted the situation addressed informally and did not want to be referenced by name in any corrective action. (*Id.* ¶ 68). In response, Cammack met with the entire recruit class that same day to speak with them about maturity and instruct them not to engage in rumors. (*Id.*).

### E. CCSO's Policies, Procedures, and Investigation into Arriaga's Complaint

The CCSO has policies in place prohibiting discrimination, harassment, and misconduct. (*Id.* ¶ 69). The CCSO also provides annual anti-harassment training which covers, among other topics, sex-based harassment. (*Id.*). Due to the nature of Arriaga's allegations, Sergeant Cammack

initiated a formal investigation on Arriaga's behalf by filing a formal complaint against Officer Devogelear with CCSO's Office of Professional Review ("OPR"). (*Id.* ¶ 71). At first, Arriaga was not willing to participate in the investigation by providing the names of individuals involved in disclosing her transgender identity or a timeline of events. (*Id.* ¶ 72). That changed on June 28, 2018, when Arriaga provided a written statement identifying Officer Devogelear and other recruits who discussed her transgender identity. (*Id.*). Arriaga began her statement by noting that "everyone in the [] Academy staff [had] been nothing but respectful to [her]" and that the Academy staff "kept [her] well informed" about the resources available for her to use if she did not feel safe. (*Id.*). On July 2, 2018, Arriaga submitted an additional statement indicating that she wanted to pursue a formal investigation. (*Id.*).

OPR's Office of Discipline, Compliance and Inspections assigned Deputy Chief Stajura and Inspector O'Donnell to investigate Arriaga's complaint. (*Id.* ¶ 73). Stajura was lead investigator and O'Donnell assisted by observing witness interviews and serving as a point of contact for Arriaga to provide additional information. (*Id.*). Arriaga provided Stajura and O'Donnell with a list of individuals she believed were involved in the events underlying her complaint. (*Id.* ¶ 74). The investigators then conducted interviews with those individuals. (*Id.*). Stajura did not identify Arriaga as a transgender person during the interviews, but by the time the interviews were conducted, the interviewees were already aware of Arriaga's transgender identity. (*Id.* ¶ 75). At the end of each interview, the investigators instructed each interviewee to refrain from discussing the interview or the investigation with anyone except their union representative or lawyer. (*Id.*).

When Stajura completed the investigation in December 2018, well after the recruits graduated from the Academy on August 24, he turned his investigation over to OPR for further

review and processing. (*Id.* ¶ 79). By this time, the recruits had transitioned into their employment with their respective agencies, meaning neither the Academy nor CCSO had authority over them to take disciplinary action. (*Id.*). Thus, OPR issued discipline to Officer Devogelear, the only CCSO employee accused of misconduct, by recommending him for termination. (*Id.* ¶ 80).

### F.  Metra's Policies, Procedures, and Investigation into Arriaga's Second Complaint

After graduating from the Academy, Arriaga went to work for Metra's Police Department. At that time, Metra had policies in place prohibiting discrimination and sexual harassment; requiring all employees to have equal terms and conditions of employment; requiring employees to treat each other with dignity and respect; and detailing the procedures available to any employee subjected to discrimination or harassment. (*Id.* ¶¶ 81, 84). Metra's Human Resources department also administered a program entitled "Sexual Orientation and Gender Identity Harassment Avoidance," which advised employees that gender identity harassment is prohibited. (*Id.* ¶¶ 82, 91).

On October 5, 2018, Deputy Chief Riggio emailed Arriaga to ask how her training period was progressing. (*Id.* ¶ 87). Arriaga responded saying "everything is great." (*Id.*). Riggio replied, encouraging Arriaga to "let [him] know if [she] need[ed] anything." (*Id.*). A few weeks later, Arriaga reported to her sergeant that she learned of rumors circulating around the Metra Police Department regarding her being transgender. (*Id.* ¶ 88). Her sergeant immediately escalated her concerns to Deputy Chief Riggio and Chief Perez. (*Id.*). Riggio and Perez scheduled a meeting with Arriaga for October 30, which Arriaga cancelled. (Dkt. 218-11 at 306). On November 1, Perez followed up with Arriaga via email, inviting her to reschedule a time to speak with himself and Riggio. (*Id.*). Perez also noted that because he had not yet spoken to Arriaga, he did not have enough information to specifically address her concerns with anyone involved in events underlying

her complaint. (*Id.*). Nevertheless, Perez asked Metra's Equal Employment Opportunity ("EEO") Department to provide additional training to the entire police department. (*Id.*).

On November 16, Arriaga met with Perez and Riggio. (Dkt. 218 ¶ 90). During the meeting, Arriaga disclosed that she heard through secondhand reports that unidentified officers were spreading rumors about her transgender identity. (*Id.*). Arriaga did not identify anyone by name. (*Id.*). On December 17, Deputy Chief Riggio emailed Arriaga to ask if the rumors were still circulating or if things had "stabilized." (*Id.* ¶ 93). Arriaga responded: "Everything has been going good. I honestly haven't heard anything lately. Focusing on working and not really on anything else when it comes to people talking. Appreciate you checking in." (*Id.*).

During the remainder of her time at Metra, Arriaga received multiple mentoring letters, acknowledging and praising her police work. (*Id.* ¶ 94). In March 2020, she was promoted to Metra's Special Operations Unit. (*Id.*). Arriaga continued her employment at Metra without incident until she resigned in April 2022. (*Id.* ¶ 96).

### G. Arriaga Files Suit

On July 31, 2020, Arriaga filed suit against Metra, Cook County, Illinois, and seven other named Defendants, initiating the present action. In February 2021, Arriaga amended her original filing with the instant First Amended Complaint, claiming that Defendants violated her Fourteenth Amendment substantive due process rights under 42 U.S.C. § 1983 by disclosing her private medical information via her transgender status (Count I) and failing to supervise Academy personnel and to protect her from harassment and discrimination (Count II). Arriaga also brings claims under state law for violations of the Illinois Civil Rights Act, 740 ILCS 23/5(a) (Count III) and indemnification (Count IV).

## **LEGAL STANDARD**

Summary judgment is proper when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56. In determining whether a genuine issue of material fact exists, the Court must view the evidence and draw all reasonable inferences in favor of the party opposing the motion. *See Bennington v. Caterpillar Inc.*, 275 F.3d 654, 658 (7th Cir. 2001); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). However, the Court will "limit its analysis of the facts on summary judgment to evidence that is properly identified and supported in the parties' [Local Rule 56.1] statement." *Bordelon v. Chicago Sch. Reform Bd. of Trustees*, 233 F.3d 524, 529 (7th Cir. 2000).

## **DISCUSSION**

### I. **Count I – Disclosure of Medical Information**

Defendants move for summary judgment on the basis that Arriaga's claims are untimely. The parties agree that section 1983 and ICRA claims are subject to a two-year statute of limitations and that the limitations period begins to run "once a plaintiff has knowledge which would lead a reasonable person to investigate the possibility that her legal rights had been infringed. *CSC Holdings, Inc. v. Redisi*, 309 F.3d 988, 992–93 (7th Cir. 2002) (citing *LaSalle v. Medco Research, Inc.*, 54 F.3d 443, 446 (7th Cir. 1995)). A plaintiff's claims accrue when she discovers that she has been injured, not when she determines that the injury was unlawful. *Jamison v. Urb.*, 411 F. App'x 919, 921 (7th Cir. 2011) (citing *Thelen v. Marc's Big Boy Corp.*, 64 F.3d 264, 267 (7th Cir. 1995)).

Arriaga insists that the continuing violation doctrine set out in *Morgan* saves her claims from untimeliness. *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101 (2002). It does not. Under the "continuing violation" doctrine, a Title VII plaintiff may recover for otherwise time-barred

11

conduct that is part of a single, ongoing unlawful employment practice if at least one related act occurs during the limitations period. *Morgan*, 536 U.S. at 116–18. *See also Hildebrandt v. Illinois Dep't of Nat. Res*., 347 F.3d 1014, 1036 n. 18 (7th Cir. 2003) ("The Supreme Court's ruling in [*Morgan*], although discussing the continuing violation doctrine in the Title VII context, applies equally to § 1983 cases."). But, as the Supreme Court clarified in *Morgan*, this doctrine is limited to claims that rely on aggregated conduct, like claims of a hostile work environment. "Hostile environment claims are different in kind from discrete acts. Their very nature involves repeated conduct." *Id*. at 115. "[T]he theory is that '[a] hostile work environment claim is composed of a series of separate acts that collectively constitute one 'unlawful employment practice.'" *Swanson v. Village of Flossmoor*, 794 F.3d 820, 826 (7th Cir. 2015) (quoting *Morgan*, 536 U.S. at 117). As such, a Title VII claim for hostile work environment is timely "as long as 'any act falls within the statutory time period,' even if the [claim] encompasses events occurring prior to the statutory time period." *Adams v. City of Indianapolis*, 742 F.3d 720, 730 (7th Cir. 2014) (quoting *Morgan*, 536 U.S. at 120).

Arriaga's § 1983 claim for disclosure of medical information is not analogous to a claim for hostile work environment. Following the rationale in *Morgan*, a disclosure is a "discrete act[]" which is independently actionable and each one triggers its own limitations clock. Here, the undisputed evidence establishes that Arriaga knew her identity as a transgender woman had been improperly disclosed to Metra employees before orientation day at the Academy on May 5, 2018 and to recruits at the Academy on June 28, 2018. (Dkt. 218 ¶ 72; Dkt. 218-2 at 62–65). Though the effect of these disclosures likely contributed to the interpersonal challenges Arriaga experienced at work, Arriaga's injury did not depend on repeated conduct. A single disclosure was sufficient to alert Arriaga of her injury. Arriaga was aware that her transgender status was disclosed

to individuals at Metra by April 2018, and to individuals at the Academy no later than June 2018. Thus, Arriaga had until June 2020 at the latest to bring her claim. Because Arriaga did not bring her claim until July 31, 2020, and because she does not produce any evidence that Defendants disclosed her transgender identity within the limitations period, Count I is untimely.

Even if Arriaga's claims were timely, they would still fail because Arriaga publicly revealed her transgender status on social media through both private messages and by joining various groups online for transgender people, each of which comprised of hundreds of members. (Dkt. 239-4 ¶¶ 53–62). Arriaga posted a picture of herself identifying herself as a transgender person and "friended" fellow recruits at the Academy who then could observe her online activities. (*Id.* ¶¶ 58–59). The groups that Arriaga joined were specifically for transgender individuals and could be accessed publicly. Less than a month before her arrival at the Academy, Arriaga posted in the "My Trans Life" Facebook group that she "had been in transition for four years now." (*Id.* ¶ 58). Arriaga's response to this is that one cannot assume that she is transgender merely because she is posting in these groups; yet, this response does not negate the fact that she posted photos of herself in these social media groups and identified her transgender status. (*Id.*).

Aside from her social media posts, Arriaga also informed two other recruits of her transgender status. Although Ariaga attributes her injury, in part, due to the disclosure of a photo of her when she was presenting as a male that was shared by a recruit, that photo was also one that was retrieved by the other recruit online; once again, demonstrating her own public disclosure. Arriaga cites to *Grimes v. Cook County* to support her claim that her private medical information was released against her will. 2022 WL 161887 (N.D. Ill. May 24, 2022). Although not precedential, Grimes clearly holds that a government official's disclosure of a plaintiff's private

information can support liability even if the information was lawfully collected or accessed, it also envisioned a scenario like the one in this case:

> Still, if [the public official] learned about [Plaintiff's] transgender status from a public source, that could bear on whether [her] status was "private" or "confidential" information—particularly if [Plaintiff herself] had made [her] status a matter of public record. *See Chasensky v. Walker*, 740 F.3d 1088, 1097 (7th Cir. 2014) (holding that a financial information privacy claim failed because the information was publicly available in court records and thus "not private"); *Willan v. Columbia Cnty.*, 280 F.3d 1160, 1163 (7th Cir. 2002) (noting that the constitutional privacy right protects against "the revelation of intensely private financial or medical information that [is] not a matter of public record"); *see also Powell*, 175 F.3d at 112 n.1 (noting that the confidentiality of a plaintiff's transgender status "may be subject to waiver"). Likewise, evidence that some of [Plaintiff's] co-workers were aware of [her] transgender status prior to [her] disclosure thereof … may tend to negate [her] privacy interest.

*Id.* at *5.

As early as 2014, Arriaga used the name "Gender Bender" on her Instagram account. (Dkt. 239-4 ¶ 54). Arriaga also maintained a Facebook page under the name "Selene Danielle" which had 1,200 followers and in that account, she was tagged in public posts from Trans Chicago. Arriaga never attempted to keep her medical condition private prior to filing suit and therefore her 1983 claim also fails on this ground.

Though Arriaga's section 1983 claim for failure to supervise and protect and her ICRA claim are arguably analogous to a claim for hostile work environment, those claims fail for different reasons.

## II.    Count II – Failure to Supervise and Protect

In her remaining § 1983 claim, Arriaga alleges that Defendants violated her Fourteenth Amendment right to substantive due process by failing to supervise recruits and protect her from discrimination and harassment. But Arriaga "faces a difficult task" in "seeking relief under section 1983." *Flores v. City of S. Bend*, 997 F.3d 725, 729 (7th Cir. 2021). "[T]he scope of substantive

due process is very limited" and courts are "reluctant to expand the concept." *Campos v. Cook County,* 932 F.3d 972, 975 (7th Cir. 2019) (alteration in original) (citations and internal quotation marks omitted). Substantive due process claims must meet a high standard which requires proof of "conduct under color of state law that 'violated a fundamental right or liberty' and was so 'arbitrary and irrational' as to 'shock the conscience.'" *Nelson v. City of Chicago*, 992 F.3d 599, 604 (7th Cir. 2021) (quoting *Campos*, 932 F.3d at 975).

As an initial matter, Arriaga does not clearly point to a fundamental right that Defendants violated when they failed to supervise recruits and protect her from a hostile work environment. Ostensibly, Arriaga seeks to invoke her right to be free from sexual harassment in an educational setting or her right to equal protection under the law. *See T.E. v. Grindle*, 599 F.3d 583, 588 (7th Cir. 2010) (It is "well-established that sexual harassment in an educational setting can violate the [Equal Protection Clause], and [] an administrator's ratification of that conduct could also violate the Equal Protection Clause.").

Still, Arriaga's claim fails because she has not produced evidence of conduct that sufficiently "shocks the conscience" to trigger a substantive due process claim. "Under this standard, abuse that is merely tortious or even 'abhorrent' does not offend substantive due process." *Viehweg v. Mount Olive*, 559 F. App'x 550, 552 (7th Cir. 2014) (quoting *Tun v. Whitticker*, 398 F.3d 899, 902 (7th Cir. 2005)). Behavior that is shocking enough to sustain a substantive due process claim typically involves the use of intentional force against an individual's person or the threat of such force. *See Rochin v. California*, 342 U.S. 165, 172 (1952) (concluding that forcible stomach pumping to retrieve swallowed evidence shocked the conscience); *Wilkins v. May*, 872 F.2d 190, 195 (7th Cir. 1989) (extorting a confession at gun-point could shock the conscience); *Hess v. Garcia*, 72 F.4th 753, 765–67 (7th Cir. 2023) (determining that sexual assault

by a public official shocked the conscience). Indeed, as explored further below, Arriaga has not produced evidence that Defendants failed to supervise and protect at all.

A. Metra

There is no evidence that Metra took any affirmative acts that created or increased a danger of sexual harassment or a hostile work environment for Arriaga. On October 25, 2018, Arriaga reported to her sergeant that she heard rumors of Metra officers discussing her transgender status. (Dkt. 239-4 ¶ 88). Her concerns were promptly escalated, and she had a meeting scheduled just two days later to discuss her concerns with Chief Perez and Deputy Chief Riggio. When Arriaga cancelled that meeting, Perez followed up via email and took steps to ensure the department received additional training by Metra's EEO department. When Riggio and Perez finally spoke with Arriaga two weeks later, Arriaga refused to assist in the investigation by identifying perpetrators of misconduct. On these undisputed facts, there simply is no evidence upon which a reasonable jury could conclude that Metra failed to supervise recruits and protect Arriaga. The evidence shows that Metra endeavored to protect Arriaga by attempting to initiate an investigation, which Arriaga prevented. And, most importantly, there is no evidence that any of Metra's conduct "shocks the conscience."

B. Cook County

Arriaga also seeks to establish *Monell* liability against Cook County. Municipalities are suable "persons" for purposes of § 1983, but they may only be held liable for their own wrongs. *Monell v. Department of Social Services*, 436 U.S. 658, 690 (1978). Thus, "a local government may not be sued under § 1983 for an injury inflicted solely by its employees or agents. Instead, it is when execution of a government's policy or custom … inflicts the injury that the government as an entity is responsible under § 1983." *Id.* at 694. So, "[t]he central question is always whether

an official policy, however expressed … caused the constitutional deprivation." *Glisson v. Ind. Dep't of Corr.*, 849 F.3d 372, 379 (7th Cir. 2017) (en banc).

In addition to establishing that Cook County's conduct shocked the conscience, Arriaga must also satisfy the three requirements of a *Monell* claim: policy or custom, municipal fault, and "moving force" causation. *Bohanon v. City of Indianapolis*, 46 F.4th 669, 676 (7th Cir. 2022). Three categories of municipal action can satisfy the "policy or custom" requirement: "(1) an express policy that causes a constitutional deprivation when enforced; (2) a widespread practice that is so permanent and well-settled that it constitutes a custom or practice; or (3) an allegation that the constitutional injury was caused by a person with final policymaking authority." *Id.* at 675 (quoting *Spiegel v. McClintic*, 916 F.3d 611, 617 (7th Cir. 2019)). "Inaction can also give rise to liability if it reflects the municipality's 'conscious decision not to take action.'" *Id.* (quoting *Glisson*, 849 F.3d at 381).

To establish municipal fault, a plaintiff must "demonstrate that the municipality itself acted with 'deliberate indifference' to [the plaintiff's] constitutional rights." *Orozco v. Dart*, 64 F.4th 806, 824 (7th Cir. 2023) (citing *Bohanon*, 46 F.4th at 675 (quoting *Bd. of Cnty. Comm'rs of Bryan Cnty., Okl. v. Brown*, 520 U.S. 397, 407 (1997)). This is a high bar. "'Deliberate indifference' is a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action." *Connick v. Thompson*, 563 U.S. 51, 61 (2011) (quoting *Bryan County*, 520 U.S. at 410).

Finally, a plaintiff seeking to hold a municipality liable must show causation. "That is, a plaintiff must show that the municipal action was taken with the requisite degree of culpability and must demonstrate a direct causal link between the municipal action and the deprivation of federal rights." *Bryan County*, 520 U.S. at 404; *Bohanon*, 46 F.4th at 675 ("[A] plaintiff bringing a Monell

17

claim must prove that the municipality's action was the 'moving force' behind the federal rights violation.") (citation omitted).

Arriaga seeks to establish *Monell* liability against the Cook County Sheriff's Office based on its failure to establish a policy that would effectively forestall sexual harassment and sex-based discrimination. *Bostock v. Clayton Cnty., Georgia*, 590 U.S. 644, 645 (2020) (discrimination on the basis of transgender status requires an actor to treat an individual differently because of their sex). Notwithstanding her failure to identify conduct that shocks the conscience, Arriaga's claim fails for the additional reason that Cook County undisputedly had a policy prohibiting discrimination and harassment in all forms, including acts based on one's "gender identity" and "sex/gender." (Dkt. 217-7 at 186–93). The policy also articulates the additional responsibilities supervisors and managers have to report, take seriously, and act promptly on allegations of discrimination. (*Id.*). Further, the policy outlines the various methods for investigating complaints. (*Id.*). To boot, Arriaga agrees that the Sheriff's Office followed the policy and procedures for investigating complaints. While the Court sympathizes with Arriaga regarding the negative experiences she had at the Academy and the effect these events had on her overall wellness, there is simply no basis for finding that *Monell* liability attaches to CCSO.

### C. CCSO and Metra Individuals

To begin, the CCSO Defendants argue that Count I is barred, as against them, by qualified immunity. Qualified immunity shields state actors from liability where their conduct "does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Stockton v. Milwaukee Cnty.*, 44 F.4th 605, 620 (7th Cir. 2022) (quoting *Reed v. Palmer*, 906 F.3d 540, 546 (7th Cir. 2018) (internal quotations omitted)). The thrust of Defendants argument is that there was no clearly established right to the confidentiality of Arriaga's

transgender status under the circumstances in which it was disclosed. Defendants do not raise a qualified immunity defense with respect to Arriaga's claim of failure to protect from discrimination and harassment. Nor could they. Sexual harassment in an educational setting and an administrator's ratification of that conduct could violate the Equal Protection Clause. *Grindle*, 599 F.3d at 588.

Nonetheless, Arriaga's claims against the individual Defendants fail. To bring a § 1983 claim against an official in his individual capacity, a plaintiff must present evidence of some personal participation by the defendant in the alleged deprivation of her constitutional rights. *See Payne ex rel. Hicks v. Churchich*, 161 F.3d 1030, 1039 (7th Cir. 1998) (internal citation omitted) ("Section 1983 creates a cause of action based on personal liability and predicated upon fault; thus, liability does not attach unless the individual defendant caused or participated in a constitutional deprivation."). A plaintiff must present evidence showing the defendant's participation or direct responsibility for the conditions of which she complains, *Starzenski v. City of Elkhart*, 87 F.3d 872, 879 (7th Cir.1996), by demonstrating a causal link between the defendant's conduct and the plaintiff's injury. *Benson v. Cady*, 761 F.2d 335, 339 (7th Cir. 1985).

Arriaga offers no such evidence. The record does not implicate any of the individual Defendants in any act of sexual harassment or hostility in the workplace; demonstrate Defendants' inattentiveness to her informal or formal complaints; or establish a genuine dispute about whether Defendants were delinquent in their duties to supervise and protect.

The undisputed evidence establishes that Perez and Riggio took prompt action to investigate Arriaga's complaints about the behavior of other unnamed Metra officers. Despite Arriaga's unwillingness to identify specific officers involved in harassing or discriminatory conduct, Riggio contacted Metra's EEO Department to have them provide additional training to

19

the entire police department to ensure that Metra officers remained aware of and compliant with their obligations.

The record is replete with undisputed evidence that Cammack took steps to make instructors and recruits aware of the Academy's policies and, when informed that individuals were violating the policy, Cammack followed CCSO's procedure for investigating complaints. Part of that action was calling on Stajura and O'Donnell to conduct a formal investigation. The evidence shows that the duo investigated the people Arriaga complained of who were accountable to CCSO. Their inability to investigate officers outside of CCSO does not amount to a failure to protect. Indeed, the CCSO individual defendants called the offices that the troublesome recruits were headed towards to inform those offices of the investigation so that appropriate repercussions could be considered. As for Rangel, there is no evidence that she had some duty to act over and above the actions taken by Cammack.

Simply put, Arriaga does not provide any evidence upon which a reasonable jury could find that any of the individual Defendants participated in or contributed to the deprivation of Arriaga's right to be free from harassment in an educational setting or her general right to equal protection under the law.

### III.    Count III – Illinois Civil Rights Act

The Illinois Civil Rights Act provides, in pertinent part, that "[n]o unit of State, county, or local government in Illinois shall … exclude a person from participation in, deny a person the benefits of, or subject a person to discrimination under any program or activity on the grounds of that person's race, color, national origin, or gender." 740 ILCS 23/5(a). Arriaga seeks to hold Cook County and Metra liable for their failure to take prompt, appropriate, and reasonably responsive actions to address her complaints of discrimination and harassment. For the reasons articulated

*supra* §§ II.A and II.B, Arriaga cannot do so. The evidence simply does not support such a conclusion.

### IV.    Count IV – Indemnification

Because Arriaga's ICRA and federal claims under § 1983 fail, so too does her indemnification claim.

### V.    Motion for Sanctions

Also before the Court is Metra's motion or sanctions and for leave to file a petition for attorneys' fees pursuant to Rule 11(c) of the Federal Rules of Civil Procedure. To impose any sanction under the Federal Rules of Civil Procedure or in the exercise of the Court's inherent authority—including dismissal with prejudice—the Court must find by at least a preponderance of the evidence that a party or attorney engaged in sanctionable conduct. *Ramirez v. T&H Lemont, Inc.*, 845 F.3d 772, 776–82 (7th Cir. 2016).

Whenever an attorney presents a pleading or motion to the Court, that attorney certifies pursuant to Federal Rule of Civil Procedure 11(b) that the document is not being presented for any improper purpose, such causing unnecessary delay or needlessly increasing the cost of litigation; that its factual contents have sufficient evidentiary support; and that denials of factual contentions are warranted. Fed. R. Civ. P. 11(b)(1)–(3). If the Court determines that an attorney has violated Rule 11(b), it may impose an appropriate sanction. Fed. R. Civ. P. 11(c)(1). District courts also have inherent power outside of the Rules to sanction parties for abusing the judicial system or acting in bad faith in the course of litigation. *Methode Elecs., Inc. v. Adam Techs., Inc*., 371 F.3d 923, 927 (7th Cir. 2004) (citing *Chambers v. NASCO, Inc*., 501 U.S. 32, 46 (1991)). In general, "courts may impose appropriate sanctions, including dismissal … against litigants who violate

discovery rules and other rules and orders designed to enable judges to control their dockets and manage the flow of litigation." *Hoskins v. Dart*, 633 F.3d 541, 543 (7th Cir. 2011).

Here, Metra seeks sanctions for three reasons: Arriaga committed perjury during her deposition; Arriaga failed to dismiss her disclosure claim despite knowing it was time-barred; and Arriaga's attorneys needlessly multiplied this litigation by failing to dismiss Arriaga's patently time-barred claim. Each basis for Metra's motion has merit.

First, a person commits perjury when she, under oath, provides "false testimony concerning a material matter with the willful intent to provide false testimony, rather than as a result of confusion, mistake, or faulty memory." *United States v. Stenson*, 741 F.3d 827, 830 (7th Cir. 2014) (quoting *United States v. Bermea-Boone*, 563 F.3d 621, 627 (7th Cir.2009)) (internal quotation marks omitted). A false statement is material if it has a natural tendency to influence or be capable of influencing the decision-maker to whom it is addressed. *United States v. Grigsby*, 692 F.3d 778, 785 (7th Cir.2012). It is sufficient that the statement is material when made; it need not affect any resulting decision. *Id.* Intent is inferred from the circumstances. *Montano v. City of Chicago*, 535 F.3d 558, 564 (7th Cir. 2008).

At her deposition, Arriaga denied having disclosed her transgender status on social media prior to May 2018. (Dkt. 218-2 at 306). She did so despite posting a picture of herself on April 10, 2018 in the "My Trans Life Group" along with the caption: "Been in transition 4 [years] now. Just got accepted to the police Academy." (Dkt. 218. Arriaga's intent to provide false testimony can be inferred by her conduct immediately following the deposition and the lack of a plausible alternative explanation. Less than 45 minutes after her deposition, Arriaga left the "My Trans Life Group" where she made the April 10, 2018 post. (Dkt. 218 ¶ 58).

To make matters worse, when Defendants sought to obtain social media information from Arriaga to determine whether she had any publicly available social media posts about her transgender status, Arriaga thwarted their efforts. (*See generally* Dkt. 115). Defendants had to bring a motion to compel this information, which the Court granted, but this occurred after Arriaga had been deposed and answered interrogatories. (*Id.*).

Arriaga's only rebuttal is that her social media activity did not amount to a disclosure or an "outing." This argument is not only unpersuasive, but it also begets credulity. Arriaga's case relies heavily on the idea that revealing her transgender identity is tantamount to disclosing her private medical information (i.e., the fact of her transition). It is incoherent for Arriaga to then argue that disclosing the fact of her transition is somehow different from disclosing her transgender status.

Whether Arriaga kept her transgender status private was not just material, it was a central issue in this case. Based in part on Arriaga's representation that "at all times" she "sought to keep her transgender status private," the Court denied Defendants' motions to dismiss. (Dkt. 47 ¶ 23). The only plausible explanation for Arriaga's conduct is that she willingly misled Defendants and this Court.

Additionally, Arriaga and her attorneys each committed a sanctionable offense by failing to dismiss the disclosure claim against Metra despite knowing the claim was time-barred. In defense of their failure to dismiss, Arriaga and her counsel take the position that each "outing" was part of a hostile work environment and, as such, the continuing violation doctrine set out in *Morgan* saves the claim from untimeliness. But there is no hostile work environment claim before the Court. Arriaga's disclosure claim posits that Metra violated her Fourteenth Amendment right to substantive due process—that is, the right to be free from unjustified government intrusion upon a

23

fundamental right—by disclosing her confidential medical information. As set out at length above, *supra* § I, disclosure of confidential medical information is a discrete act and, thus, is not like a claim for hostile work environment. Arriaga and her attorneys make no effort to distinguish between the claim at bar and discrete acts of discrimination explicitly excluded from coverage under the continuing violation doctrine. *See Morgan*, 536 U.S. at 114 (finding that claims stemming from discrete acts of discrimination must be filed within the appropriate time period). Rather, without explanation, they rest their hats on the unstable proposition that the failure to disclose claim is essentially a hostile work environment claim. It is not.

It would have been appropriate to voluntarily dismiss the disclosure claim and amend the Complaint to include a hostile work environment claim. But they did not, and they offer no explanation for the decision not to do so. Arriaga and her counsel cannot save themselves or this case by arguing that they should benefit from a doctrine intended to save a claim they chose not to bring. Thus, for the legal reasons above and as a sanction for Arriaga and counsel's conduct, this case is dismissed with prejudice.

## **CONCLUSION**

For the foregoing reasons, Defendants' motions for summary judgment [214, 216, 217] and motion for sanctions [230] are granted.

_____
Virginia M. Kendall
United States District Judge

Date: September 4, 2024

24